A92A1863. THOMAS v. THE STATE.
(426 SE2d 923)

BLACKBURN, Judge.

Howard Emmitt Thomas was convicted by a jury of trafficking in cocaine and possession of marijuana with intent to distribute, and was sentenced to consecutive sentences of twenty and ten years in confinement for the crimes. He appeals, contending that the evidence was

insufficient to support the conviction.

On January 29, 1992, a roadblock was operated at the intersection of Georgia Highways 94 and 76 in the City of Morven, Georgia, by Michael Weldon, the Morven Chief of Police, and Jimmy Norton, a Georgia Public Service Commission employee. At about 11:10 p.m. Thomas, who was driving west on Highway 94 toward Moultrie, Georgia, encountered the roadblock. He was driving a 1992 Mercury Topaz car which had been rented in Orlando, Florida, by his uncle, and for which Thomas was listed on the rental agreement as an authorized driver. The rental agreement provided that the car was to be returned to the rental agency in Orlando by January 27, 1992, which meant that at the time of the stop at the roadblock the car was two days overdue for return.

Weldon testified that he discovered from the rental agreement that the car was two days overdue for return to the rental agency. Weldon said that he asked Thomas where he was going, to which Thomas replied that he was going to Moultrie to pick up his niece, but that Thomas then "act[ed] nervous," avoiding eye contact and giving no response when asked for the niece's name and telephone number. Weldon testified that he noticed that a beeper (a paging device) was in the car, and that there was no noticeable clothing or luggage in the car. His suspicions aroused, Weldon asked Thomas whether he had "anything illegal" (Weldon's words) or "any contraband or any weapons or anything like that in the car" (Norton's words). According to Weldon and Norton, Thomas replied in the negative, but agreed to let Weldon search the car. Weldon and Norton testified that when Thomas got out of the car they observed a large bulge in the front of his pants, at which point Weldon searched the car. Weldon testified that he found what appeared to be two marijuana cigarette butts in the ashtray. After smelling one and deciding it was marijuana, he placed Thomas under arrest for possession of marijuana.

According to Weldon and Norton, Weldon began patting defendant down, but when he tried to check the bulge in his pants Thomas broke and ran north up Highway 76, chased by Norton. Weldon said that, after securing the Topaz by taking its keys and locking the doors, he also gave chase. A resident of Morven, Edward Powers, testified that he saw part of a man's flight through the city during the period when Thomas was fleeing. He saw the man run west along Fifth Avenue from its intersection with Highway 76, running in front of a fire station on the south side of Fifth Avenue. Powers said he lost sight of the man when the man turned the corner of the building, but he heard him step "on some old tin that was laying there." As Weldon drove by Powers, he pointed Weldon in the direction he had seen the man run. Weldon said he proceeded west along Fifth Avenue and, as

he passed the fire station and came even with a car owned by another resident of Morven, Roy Reams, which was parked in a yard on the north side of Fifth Avenue, he looked south and saw Thomas headed back toward Highway 94, toward the Topaz.

Thomas was apprehended at the Topaz and was searched again. By that time, Weldon and Norton said the bulge in Thomas' pants was gone. Norton left the scene shortly thereafter to go off duty, and Weldon summoned the assistance of Special Agent Alfred Anderson, a member of the Lowndes County/City of Valdosta drug suppression unit, who was the handler of the unit's drug detection dog. Weldon and Anderson used the dog to search the Topaz, but found no drugs. Anderson testified that they did find a bag of charcoal in the trunk. Anderson further testified that charcoal was often used by persons in the drug business to throw drug detection dogs off the scent of drugs.

Weldon and Anderson testified that, assisted by Powers, they then walked the area where Thomas had fled. During this search a plastic bag was discovered on the ground near Roy Reams' car. The bag was at "the front of the car" (Anderson's words); "right up under the bumper" of the car and "right at the corner of the bumper" (Weldon's words); and "up on the back of the side up under the bumper" and "[o]n the passenger's side up under" the car (Powers' words). There was evidence that the owner left the car parked at that location for long periods without moving it, and that there was nothing to restrict anyone's access to the area near the car. However, there was also evidence that it had rained that night, and that, according to Weldon, the bag "would have been wet if it had been there earlier," but that the bag was dry.

A forensic chemist from the Georgia Bureau of Investigation State Crime Laboratory testified the bag contained 16.8 grams of marijuana in 29 bags, 48.7 grams of 90 percent pure crack cocaine in a single bag, and cigarette papers.

Two days after the arrest, on January 31, 1992, Weldon went to the jail where Thomas was being held, read Thomas his *Miranda* rights, and questioned him. Weldon obtained no written statement from Thomas, but according to Weldon Thomas orally admitted as follows that the bag containing cocaine and marijuana and the marijuana cigarette butts belonged to him: "I asked him what did he do for a living, did he work? And he said that he hustled stuff. I said what do you mean, what kind of stuff? He said T-shirts, hats, anything to make a dollar. I asked him what are you doing with a beeper and he said for communications. I said what do you mean for communications? He said that's so his mama or daddy could get a hold of him. I asked him was the drugs that I found, was that his. And at that time, he said no. I asked him why was he headed to Moultrie and he said to pick up his niece."

Weldon said that after more questioning Thomas "changed his mind," "said, look, man, I was carrying the stuff to Moultrie, . . . referring to the drugs," where "he said he was going to sell them on the streets. He said he wasn't carrying them to nobody in particular, he was just going to carry them over to Moultrie and try to sell them. I then asked him how much did he pay for the drugs and he said $900." Weldon further testified that "I asked him how, you know, if he didn't work, did he get a check, and he said no. I asked him well, then, how did you come up with $900 to buy the dope with to come up here and resell. He said that he saved up his money that he got from hustling. . . . He said he was going to go to a motel [in Moultrie] and stay there until he sold the drugs and he would return then to Orlando."

Thomas testified at trial, contradicting much of the testimony by Weldon, Norton, and Powers. He said that he had been driving from Orlando, Florida, his place of residence, to Moultrie to visit a cousin. According to him, after he stopped at the roadblock Weldon "asked me did I have a driver's license and insurance. So, I handed him my driver's license and I handed him this [rental] agreement right here. And all he did was look at my license and look at the agreement and give it right back to me, and asked me can I search your car and I said no. He said — he pointed up in front of me and he said pull up over there. So, when I pulled up over there, he came up to me and said get out of the car. I got out of the car and by me telling him no that he couldn't search my car, I felt when he told me to get out that he was going to produce a warrant or something, to go get a warrant or something. But, he jumped right in the car, he jumped right in the car behind, you know, once I got out. And I asked him, I told him again what are you searching my car for. And he said see, you guys here driving these kind of cars here with these out-of-state tags from Florida is bringing drugs in our state or in my county, like that. And he got out of the car and begin to search me, begin to search me."

According to Thomas, he had no drugs with him, had no bulge in his pants, and threw no drugs under any car. He also maintained that, contrary to Powers' testimony, during his flight from Weldon he had neither stepped on any tin nor even gone past the area where the bag was found. When asked why he ran from Weldon, he replied that "I ran because when he pushed me — well, when he started searching me, he slammed me up against the car. I said, I told you you don't have no right to search me, like that. And he said, well, the hell I don't, this is South Georgia, and I'm the chief of police in this town and I do what I want to do. So, when he did that, I told him again you don't have no right to search me. So, he took his stick, his nightstick and started beating it in the side of my ribs right here. I just fear my life [sic], you know, I was scared so I ran."

When asked why he had a beeper, Thomas claimed that he worked for his parents, who had a janitorial service, and that he had the beeper for communication. He denied having made the statement Weldon contended he made during the jail interview. He further contended that he had not put the bag of charcoal in the trunk of the Topaz, and had not used the ashtray during the trip from Orlando. He also denied having told Weldon that he had a niece in Moultrie.

In rebuttal testimony, Weldon denied having beaten Thomas with a stick.

The trial court instructed the jury on both actual and constructive possession, and the jury returned a verdict of guilty as to the counts charging Thomas with trafficking in cocaine and possession of marijuana with intent to distribute. We note that Thomas was acquitted of charges of obstruction of an officer and misdemeanor possession of marijuana.

On appeal, Thomas contends in his only enumeration that the evidence was insufficient as a matter of law for any rational trier of fact to find the essential elements of the offenses charged beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). He argues that the state did not carry its burden of proving that he ever had actual or constructive possession of the plastic bag, in that there was no physical evidence to connect him with the bag other than a possibility of spatial proximity which is not enough to support the conviction, see *Murrell v. State*, 200 Ga. App. 231, 232-233 (1) (407 SE2d 460) (1991). He says that no witnesses were produced to support the state's theory that he had been near the site where the plastic bag was found, or to show that anyone saw him remove any item from his clothing or place anything near the car where the plastic bag was found. Although he acknowledges the testimony that he had a bulge in his pants, he points out that no contraband was seen inside his pants or retrieved from them, and argues that the circumstantial evidence regarding the bulge was not sufficient to "exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-4-6. See *Byers v. State*, 204 Ga. App. 552, 554-556 (3, 4) (420 SE2d 23) (1992).

The state asserts that the evidence against Thomas was not wholly circumstantial, since he gave a statement admitting his possession of the plastic bag, see *Stewart v. State*, 163 Ga. App. 735, 737 (1) (259 SE2d 112) (1982). The state further asserts that, when examined in the light most favorable to the verdict, the evidence was sufficient to meet the test of *Jackson v. Virginia*.

We agree with the state in both respects. Although Thomas' testimony contradicted much of the state's evidence, our review of that evidence in the light most favorable to upholding the verdict shows that the state adequately established more than mere presence at the

scene and mere spatial proximity to the plastic bag. See *Murrell,* supra; *Byers,* supra. The evidence introduced at trial, construed most favorably to the state, included the following: Thomas had marijuana cigarette butts in the ashtray of his car. He gave false information to Weldon that he was going to see a niece in Moultrie. When Weldon attempted to retrieve the bulge in Thomas' pants, he fled, and the bulge was gone when he returned to his car. Although Thomas testified that he ran to avoid a beating by Weldon, Weldon testified that he did not beat defendant. The plastic bag was found along the route indicated by the observations of Weldon, Norton, and Powers. Although the car where it was found was often parked there for long periods, the bag was exposed to the elements and displayed no moisture from that evening's rain, authorizing the conclusion that the bag had only recently been placed under the car. A bag of charcoal, which is sometimes used by persons transporting drugs to throw drug detection dogs off the scent, was found in the trunk of Thomas' car.

Based on the foregoing facts, the inferences most favorable to the verdict are that Thomas bolted during Weldon's search of his person because the bulge was caused by the plastic bag and he did not wish Weldon to retrieve it; that he threw it away during his flight; and that the same bag was retrieved by Weldon and Anderson soon afterward.

Finally, independent of the above facts and inferences, there is the fact that Thomas himself admitted to having possessed the cocaine and marijuana with intent to distribute.

Given the foregoing, we find that the evidence was sufficient to permit a rational trier of fact to find Thomas guilty beyond a reasonable doubt of trafficking in cocaine and possession of marijuana with intent to distribute.

*Judgment affirmed. McMurray, P. J., and Cooper, J., concur.*

DECIDED JANUARY 22, 1993.

*Mark Thedieck,* for appellant.

*H. Lamar Cole, District Attorney, James E. Hardy, Mark E. Mitchell, Assistant District Attorneys,* for appellee.